Thank you your honor. The issue in this case is a factual one. It depends on whether the police officers who stopped and arrested Mr. Holly saw him commit a traffic violation running a stop sign at the intersection of Swope Parkway and College Avenue. I want to begin my argument by addressing the argument of the government at page 25 and 26 of its brief. If you look at the government's addendum, and I'm looking at pages A2 and A3, you will see two still at 117, which was a video, and the government has slowed it down here and captured it in a single screen. These two photographs show the point of view of Officer Wettrow. He was in the passenger side of the police vehicle that stopped Mr. Holly. On A2, the government's point here is if you see the block, the square that says white USPS van, the government's position is that Mr. Holly's vehicle was just behind that van as he traveled north on College Avenue. The government is saying that the van blocked out. If that van had not been there, you would have been able to see Mr. Holly's vehicle as he traveled north on College. I want to assume, for the purposes of that argument, that the government is correct. Officer Wettrow testified that he saw Mr. Holly through this parking lot just north of the strip mall depicted in A2. Officer Wettrow, but that was not the point at which he saw Mr. Holly run the stop sign. He does not see Mr. Holly run the stop sign until the point of view in A3. That is after the officers rounded the corner at Agnes and Swope and turned onto Swope Parkway. There you see the white box that says target car. That is the point at which Officer Wettrow supposedly saw Mr. Holly run the stop sign. The government points out in its brief that the still photo in A2 was taken at the seven second mark on Exhibit 117. The government contends that A3, and I agree with the government, that the photo in A3 is taken at the 15 second mark on Exhibit 117. Therefore, you have a gap of eight seconds between those two positions. But Officer Wettrow is saying he saw Mr. Holly's vehicle at the seven second mark across the parking lot, but also at the 15 second mark and in A3. The vehicle, if it's running, if it's moving and running the stop sign, it can't remain at the same position as in A2 or A3. If it was moving through the stop sign, it would already be past that. Exhibit 117 is a defense exhibit. It was a defense investigator's attempt to recreate the situation regarding this stop. The defense investigators, when they filmed this, they stopped briefly at the stop sign at Agnes and Swope Parkway. If you look at the video, Exhibit 117, you'll see that the defense vehicle stops at the 11 second mark, I believe, and then picks up again at the 13 second mark. Even if you subtract, now the officers didn't do that. They ran that stop sign. They slowed down and they paused, but they continued on through. But even if you take out those two seconds that they took the defense investigators to go through that stop sign, to pause, you still have a six second gap. Mr. Holly's vehicle should not be in the same position at A2 if six seconds later, he's supposed to be running the stop sign at position A3. That doesn't make sense. Officer Letro's testimony is internally inconsistent. I think that's a basis for saying that the defense found that Officer Tarwater saw, actually saw Mr. Holly run the stop sign. Counselor, do we know if your investigators, I don't know if it was an iPad or a camera or what it was, but do we know that it was at the same height and same position as the two officers' vantage points? Your Honor, we know that it's very close. So the officers are riding in a Ford Escort, which was measured to be 70 inches in height. The defense investigators are riding in a Ford, I'm sorry, Ford Explorer, not an Escort, Ford Explorer. The defense investigators are in a Ford Explorer sport track, which was measured at 72 inches in height. Now, the defense investigator said that the additional two inches could have been due to a luggage rack that's on top of the sport track, but even if that's true and we subtract those two inches, both vehicles are at 70 inches. The iPad is being held, though I don't think there was specific testimony on the exact height of the iPad as it was held when they made the video. If I recall right, one of the officers was quite tall, I thought maybe 6'3", or something like that. Officer Letro was 6'3", and the defense investigator who drove their vehicle was 6'1". Now, he testified that he also drove the same route in a Jeep Wrangler that I believe was 71 inches in height, and that he tried to reach up and get his head all the way, stretch up another couple inches, to see if he would match Letro's height. But, for purposes of, you know, I'm saying that I will give the government, for purposes of this argument, that they could actually see Mr. Hawley's vehicle beyond that white van. So, I'm giving them the height advantage. When they actually make the turn, the target vehicle appears to be pretty clearly in sight when I looked at the video. Well, I would disagree with you on looking at, I believe at the Exhibit 117. Now, you can see a little sliver of the vehicle on A3, behind that white van, where it says target car, but my point is, it can't both be in the same position on page A2 as it is on page 3. Now, what Officer Tarwater says is, he testifies, as they come around the berm, rounding the corner on Agnes onto Swope, that Mr. Hawley's vehicle is already crossing the eastbound lanes of Swope Parkway. So, Letro and Tarwater are both saying, as we round the corner, as the berm passes and we're able to see Mr. Hawley's car, Tarwater says it's coming through the stop sign. Excuse me, Letro says it's coming through the stop sign. Tarwater says it's already in the eastbound lanes of traffic. So, my point is, Mr. Hawley's car can't exist in two different positions at the same point in time. The officers are inconsistent with one another, and Officer Letro's testimony is internally inconsistent itself. Another point that I want to make is that the district court found that, as the officers drove north on Agnes, that Officer Letro had testified that he had visual contact with Mr. Hawley's vehicle almost all the time. If you look at Defendant's Exhibit 118, that establishes that that factual finding is clearly erroneous. There are buildings between Agnes and College. There's no way that you could see all the way through College until you reach that strip mall, depicted in A2. Now, my point here is, Tarwater is saying, I think the vehicle was going so fast, there's no way he could have stopped for that vehicle and still be crossing the eastbound lanes when I saw him. My point is that Officer Tarwater had no ability to track or pace Mr. Hawley's car, because you can't see from Agnes to College. If I'm doing 40 miles an hour, and I'm on Agnes, and Mr. Hawley's doing 40 miles an hour on College, and I have a clear vision, I can say, yes, his car is in front of me, so he's probably doing over 40, or no, his car is behind me, so he's probably doing under 40. Tarwater never had the ability, he just couldn't, to make that type of determination to say yes, he was traveling at a rate of speed that made it impossible for him to stop at that stop sign. The other thing that has to be remembered, which I don't believe the district court mentioned, was that Mr. Hawley had a much shorter distance to travel than the officers did. Hawley began at 49th and Walron, the officers began at 49th and Montgall, between Montgall and Chestnut. They had roughly two and a half to three blocks that they had to travel west before turning north up to Swope. Also, if you look at Defendant's Exhibit 105, you'll see that Swope Parkway slopes south as it goes east, making Mr. Hawley's distance to travel much shorter. I see that I've ran through all of my time, thank you. Very well, thank you for your argument. Mr. Wagner, we'll hear from you. May it please the court, David Wagner for the United States. I'd like to start by addressing Ms. Kurz's point about pages A2 and A3 of the addendum to the government's brief. I think she's making two assumptions that just aren't supported by the record when she points out that the car couldn't have been in two places at once. The first assumption is that the investigators were going the same speed as the officers as they rounded the curve. I think the video shows that's not right. The dash cam video shows the officers were going very quickly as they approached the corner from Agnes onto Swopes and then made the turn. I think you can't assume that, as she was asking the court to do, that there was only a two second difference because that assumes that the investigators were going at the same speed as the officer. The second point is it's also assuming that when the officers looked across the parking lot from Agnes to College, that Mr. Hawley's car at that point was in the exact same position as the investigator's car, which was parked right behind the stop sign. That's also not in evidence. The officer said they could see Mr. Hawley's car on College, but they never said it was at the exact point where the investigator's car was parked, which was immediately behind the stop sign. For those reasons, I don't think the points about pages A2 and A3 of the government's addendum discredit the officer's testimony at all. What about the testimony, though, and I think maybe even the court's finding, that they could see from Agnes to College and see the defendant's car the entire time. It seemed to me pretty clearly that partially it was blocked by buildings and then even at one point by a berm. You're absolutely right, and I think that is a confusing point of the R&R in this case, and I don't think that officers were testifying that they could see from Agnes to College the whole way. But their testimony was, as they were driving north on Agnes and reached the little drive into the parking lot to their right, at that point they could look across and see College. That's what we showed on page A2 of the government's addendum, that that's, in fact, correct. You can look across the parking lot at that point. At what point precisely? When they make the turn, I can pretty clearly see the car, the target car. Before that, it's a little dicey. At what point do they say, we saw it run the stop sign? Officer Wetro said that he saw the stop sign as they were making the turn, and he, in fact, noted that on one of the exhibits. If you look at page A1 of the addendum to the government's brief, you can see in the intersection of Swopes and Agnes, there's a little P. It's sort of faint, and it's very small, but it's there. That was, I believe, Officer Wetro's notation showing the point he was at when he could see Mr. Holley's car run the stop sign. And I think Defense Exhibit 117 supports that testimony and shows that, indeed, at that point, just as you're rounding the turn, the berm sort of falls away, and you can see through to the intersection of College and Swopes. I think it's exactly consistent with his testimony. Counsel, I've got a question. The magistrate judge's report that was adopted by the district court says that both officers testified that they observed Holley fail to stop. Is that accurate? It's accurate in the sense that their observations led both of them to conclude that he failed to stop. I don't think it's accurate. They didn't testify to that, though, did they? Officer Wetro did. Officer Tarwater did not. Officer Tarwater's testimony, and he was the driver, of course, was that he saw the speed of Holley's vehicle right before the stop sign when he looked across the parking lot, and then after he checked for traffic and made the turn, he saw the vehicle traveling at the same speed out into the intersection, and he was able to infer that it wasn't able to stop. Right. And similarly, on pages one and six of your brief, you indicate that both officers saw Holley's vehicle run the stop sign. Again, that would not be accurate. Would it? I think it's generally accurate, Your Honor. I think it's accurate in the sense that... You mean generally? I mean, either it's accurate or it isn't. It sounds like you're saying it's not accurate because one of them made an inference and didn't actually see the vehicle run through the stop sign, but go ahead and answer. That's completely fair. My point was going to be that their observations led both of them to conclude that he hadn't stopped, but you're correct, that only one officer, Officer Wetro, who was the passenger, testified that he saw the exact moment when Mr. Holley ran the stop sign. And I don't think the magistrate judge was confused about that either. And in fact, I think if you look at pages four and seven of his report and recommendation, he makes this clear. I think, unfortunately, I think I used some of the same loose language that he did in saying both of the officers observed it, but I think he understood the difference, I think, is very clear from his R&R. Oh, I also wanted to address- Makes that clear when he says they both observed it, what makes it clear that he understood that only one of them observed it? Well, if you look at page four of his R&R, give me just a second to get there. Towards the bottom of paragraph 11, he summarizes officer's testimony that, in my training and experience, I don't believe there's any way that he, Holley, stopped at the stop sign based on his speed that I observed him at on college. And then when we entered into Swope, the speed that he continued through the intersection. That, I think, makes it clear. And then again on page seven, and this is towards the bottom of the middle paragraph on the page, the R&R says that officer Tarwater testified that he could tell from the speed of Holley's vehicle as it traveled into the intersection of College and Swope Parkway that Holley could not have come to a full stop at the stop sign. Okay, thank you. And I do apologize for the imprecision of the language in the government's brief, but I think from those portions of the R&R, it's very clear that the magistrate understood what the testimony was. And just to back up for a minute, I'd like to address the standard of review here, because this case is really about a credibility finding. And of course, that's something that this court on appeal affords great deference to. The magistrate judge found that both officers testified credibly about what they observed. And I don't think there's anything in the record that would undercut those credibility findings. Counsel, would you agree that there's a difference legally between a credibility determination and a finding effect? That's a good question. I think technically the standard of review for both is clear error, Your Honor. But I do think that this court's opinions have said that, have used language like great deference when addressing credibility findings. And also, I think other language is they are virtually unassailable on appeal. So even though I think technically the standard of review is clear error, there is a recognition that credibility findings are due some level of further deference. So this question goes to the standard of review also. So what facts, if any, in the record are you relying on to show a reasonable suspicion for the stop as opposed to credibility determinations or characterizations of testimony? Well, the only evidence in the record to show reasonable suspicion for the stop was the officer's testimony. They're the only ones who observed what Holly's car did at the stop sign. Mr. Holly did not testify. So they're the only ones that saw what happened. And this court's cases are very clear that there doesn't have to be more. An officer's testimony about what he observed is sufficient to support reasonable suspicion, or I would say even probable cause for the stop. I just want to address quickly the point that Officer Tarwater and Officer Letro's testimony was inconsistent in that Officer Letro said that he observed the car go through the stop sign as they made the turn, and Officer Tarwater said that he saw the car come out into the intersection. I don't think that's inconsistent at all. It simply reflects the fact that as they made the turn, Officer Tarwater, who was driving, was checking left to make sure the way was clear before he turned right onto Swope. So he was glancing left while Officer Letro the whole time was looking right. I think that's the explanation for that apparent discrepancy. And then just finally, I think, as the court is thinking about the video evidence and the officer's testimony, it's important to keep in mind that the video evidence, while I think helpful in corroborating the officer's testimony when viewed carefully, is not perfect. It was not a perfect recreation of the scene. The vehicles were slightly different. The height of the observers were different. The cars in the parking lot between Agnes and College may have been different. In the iPad video, I don't think it shows everything that a trained officer's eye could see, someone who is familiar with the neighborhood. I think, in the end, it showed that the district court's credibility finding... With the ability to see... I didn't understand your last point. You said you don't think the video could show everything a trained officer could see, but... I'm just... You know, see through a berm or anything like that. What are you trying to get at there? No, I'm not suggesting x-ray vision or anything like that. I'm just saying that officers are trained to observe traffic violations, and I think they may be more perceptive about seeing those things than some of the rest of us. Okay. Thanks for clearing that up. You have anything further? No, I'll just end by asking the court to affirm. All right. Thank you. Ms. Kurz, you used your time. We'll give you one minute for rebuttal. You look eager to say something, so please proceed. But take off your mute button first. There we go. I just wanted to address Judge Braza's question about a difference between a credibility finding and a finding of fact, and just point out that the district court judge found this to be a very difficult case. And he said, I don't think that anybody is lying to me. I think all four, the two defensive investigators, the two officers, saw what they saw. And so this is very different from most cases where you have a district court judge saying, I just don't believe that witness. I don't find them credible. They're not being truthful with me. I have to go with the other side. Here, it was very, very difficult. And I think if you look at the objective evidence as opposed to the subjective interpretation of the officers, you will find that the district court's findings were clearly erroneous. I just want to point to the legal standard in the United States versus Scott, which is cited in the brief. It's virtually unassailable, but only if an officer's story is not contradicted by inconsistent. Thank you. Very well. Thank you both for your arguments and for appearing by video conference. The case is submitted, and the court will file an opinion in due course.